TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JOSEPH D. AXELRAD (Cal. Bar No. 274580)
Assistant United States Attorney
Violent & Organized Crime Section
    1300 United States Courthouse
    312 N. Spring St.
    Los Angeles, California 90012
    Telephone: (213) 894-7964
    Facsimile: (213) 894-0121
    E-mail:   joseph.axelrad@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-00292-MCS (JCx) |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S REQUEST FOR BAIL |
| v. | |
| SCOTT QUINN BERKETT, | Hearing Date: August 25, 2021<br>Hearing Time: 1:00 p.m.<br>Location:   Courtroom of the Hon. Jacqueline Chooljian |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Joseph D. Axelrad hereby files its Opposition to Defendant's Request for Bail.

//

//

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 24, 2021          Respectfully submitted,

                                      TRACY L. WILKISON
                                      Acting United States Attorney

                                      SCOTT M. GARRINGER
                                      Assistant United States Attorney
                                      Chief, Criminal Division

                                      */s/ Joseph Axelrad*
                                      JOSEPH D. AXELRAD
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE


MEMORANDUM OF POINTS AND AUTHORITIES.................................1
I.    INTRODUCTION....................................................1
II.   STATEMENT OF FACTS..............................................2
      A.    Defendant Attempted to Hire a Hitman Via the Dark Web.....2
      B.    Defendant Confirms Desire to Have R.E. Murdered During
            Series of Conversations with Undercover Agent.............4
      C.    Relevant Background.......................................6
III.  ARGUMENT........................................................7
      A.    Legal Standard............................................7
      B.    Defendant Is A Danger to Victim R.E. and the Community....8
      C.    Defendant Presents A Substantial Risk of Nonappearance...10
IV.   DEFENDANT'S PROPOSED BOND CONDITIONS ARE INSUFFICIENT.........11
V.    CONCLUSION.....................................................12

## **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Scott Quinn BERKETT's ("defendant") obsession with the death of his ex-girlfriend requires that he remain detained pending trial.  On April 28, 2021, as he sought to hire a hitman to kill his girlfriend via the DarkWeb, defendant stated:

> "I would like proof of her death sent to me.  ***She has a distinctive tattoo on one of her forearms that I know the image of, so a photo of her corpse and a photo of her tattoo for identification would work***.  I'll refrain from sending a picture of the tattoo to avoid doctored photos.
> If possible, letting me know if she was in Arizona or Idaho wuld [sic] also be appreciated so I can also verify via the obituaries."

And when defendant was contacted by an undercover law enforcement agent ("UC") posing as the hitman, defendant restated that all he needed was a "picture of the corpse and a picture of the tattoo . . . to verify. . . ".  His words leave little doubt as to his desire and intent to see his ex-girlfriend murdered.

Defendant is alleged to have orchestrated a murder-for-hire plot during which he utilized the DarkWeb, transmitted a cryptocurrency payment via a bitcoin wallet, provided highly detailed instructions about how to murder his ex-girlfriend, issued demands intended to avoid being scammed and to guarantee her death, and attempted to develop an alibi to ensure he avoided detection by law enforcement.  Defendant's conduct was planned, deliberate, and, most concerning, highly sophisticated.

For his efforts in trying to secure the murder of his ex-girlfriend, defendant was charged with a violation of 18 U.S.C. § 1958(a), Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire. See United States v. Berkett, CR No. 21-292-MCS. Following his initial appearance, defendant sought a continued detention hearing and, on June 7, 2021, the Court heard argument and determined defendant should remain detained pending trial. (Dkt. 17.) Now, defendant seeks reconsideration of that detention order without any changed circumstances and on essentially the same proposed bond as the Court previously rejected.

Given all of the facts, defendant remains unsuitable for pretrial release. Specifically, (1) the dangerous, deliberate, sophisticated, and obsessive nature of defendant's plot to murder his ex-girlfriend demonstrates he is a danger to the community; (2) defendant's apparent technological savvy render almost any attempt to limit his access to the internet meaningless; (3) defendant's stated mental health issues only exacerbate the concern for dangerousness; (4) defendant's proposed bond does not mitigate his danger; and (5) the evidence of defendant's guilt is overwhelming. The government respectfully submits that this Court should affirm its prior order and deny defendant's request for bond, as defendant's release would endanger the community, and, in particular, his ex-girlfriend.

**II. STATEMENT OF FACTS**

**A. Defendant Attempted to Hire a Hitman Via the Dark Web**

On April 22, 2021, defendant, while using the screenname "Ula77," explained to another user of the Dark Web that he was "saving up for a simple hit. Ill be putting the job in as soon as I have the BTC [Bitcoin]." Five days later, on April 27, 2021,

defendant told to a Dark Web user that he believed could provide murder-for-hire services, "Hello, I was hoping you would be the person to contact if I had questions on what sort of information I would need to have ahead of time when placing a hit if I dont have the address, and if I can make small requests for once the hits been carried out IE: Make sure to destroy the phone of the target."

The next day, on April 28, 2021, defendant transmitted $11,000 of Bitcoin to the Dark Web group he believed would facilitate the murder of his ex-girlfriend, victim R.E. Defendant submitted an "order," providing R.E.'s full name, Facebook account, physical address in Idaho, email address, and nicknames. Defendant also included an "Order Description," which stated, "***I'd like it to look like an accident, but robbery gone wrong may work better. So long as she is dead. I'd also like for her phone to be retrieved and destroyed irreparably in the process***." Defendant followed up with a series of instructions, stating "I would like proof of her death sent to me. She has a distinctive tattoo on one of her forearms that I know the image of, so a photo of her corpse and a photo of her tattoo for identification would work. I'll refrain from sending a picture of the tattoo to avoid doctored photos. If possible, letting me know if she was in Arizona or Idaho wuld [sic] also be appreciated so I can also verify via the obituaries."

Next, on May 9, 2021, defendant stated, "Ive updated the order so that the bounty matches with what you informed me the hitman was requesting for the job: 2000 extra to check both locations and 2000 extra to destroy the phone, and the original 9000 bounty, for a total of 13000. I look forward to receiving communications that will let me know when, approximately, to prepare my alibi."

**B. Defendant Confirms Desire to Have R.E. Murdered During Series of Conversations with Undercover Agent**

On May 19, 2021, a UC, posing as the hitman defendant hired via the Dark Web, contacted defendant via WhatsApp. During a series of recorded calls, the UC confirmed that R.E. was the individual defendant wanted murdered and that he had paid $14,000 to fulfill the murder-for-hire contract via the Dark Web and using Bitcoin.

During subsequent conversations, defendant and the UC discussed details of R.E.'s murder, including defendant's desire that the murder be made to appear as a robbery gone wrong or accident. Defendant expressed concern that the murder not be traced back to him and confirmed his desire for a proof-of-death photograph of R.E.'s distinctive tattoo. Specifically, defendant and the UC had the following exchange:

> UC: Good. Alright, so my understanding is what has to get done is this has to get done, uh we're looking at some kind of accident or robbery to have gone wrong, right?
>
> DEFENDANT: Yeah.
>
> UC: Okay.
>
> DEFENDANT: That way it doesn't get traced.
>
> UC: Right, and then we need to work on making sure your alibi is good. Um, and then we need some, you want some kind of proof, and there's, if I'm, if I'm getting the information right, it's some kind of phone that needs to be taken care of as well, right?
>
> DEFENDANT: Yeah.
>
> UC: Okay.

      DEFENDANT: Uh, proof of the uh tattoo on her, one of her forearms.

      UC: Okay. Do you want, is there, do you want that tattoo? Is that part of this?

      DEFENDANT: Just need a picture of it to verify.

In fact, during his conversations with the UC, defendant repeated his concern for a scam, that is, he wanted to ensure that the thousands of dollars he paid for R.E.'s murder would actually result in her death. Specifically, the following exchange took place:

      UC: Okay. What, is there any part of it, so, do you wanna see? Do you want a video of her not breathing? What do, what do you want to see?

      DEFENDANT: Um, picture of the corpse and a picture of the tattoo, of the tattoo, to make, to verify . . .

      UC: Okay.

      DEFENDANT: . . . Just so that way, cuz there were warnings of like, hey, make sure it's not photo-shopped.

During the conversations that followed, defendant and the UC also discussed developing an alibi, with defendant stating, "There's a few places nearby maybe that, that uh can put me on camera." When the UC asked for any additional helpful information about R.E., defendant explained that she has a dog, that her family has a gun, and that she "has weak heart . . . any feigning a drunk driver situation would probably be very easy to pull off . . . and wouldn't have as high of a survival chance." When the UC asked defendant for an additional payment of $1,000, defendant promptly wired the money via Western Union.

Finally, on May 21, 2021, the UC told defendant that the murder would happen that day. To develop his alibi and ensure he was recorded on a surveillance camera at the time he believed the murder would take place, defendant drove to a nearby grocery store where he purchased alcohol. Defendant was arrested as he got into his car outside the grocery store.

Following his arrest, defendant waived <u>Miranda</u> and agreed to be interviewed by law enforcement. During a recorded interview, defendant admitted to, among other things, using the Dark Web; making a Western Union payment; knowing where R.E.'s family lived in Idaho and where R.E.'s sister lived in Arizona; and owning Bitcoin and having a CoinBase wallet. Defendant also claimed to have multiple personalities, one of which he identified as violent.

C. **Relevant Background**

On May 21, 2021, defendant was charged by complaint with murder-for-hire in violation of 18 U.S.C. § 1958(a). (Dkt. 1.) On May 24, 2021, defendant appeared on the complaint. On June 7, 2021, this Court held a continued detention hearing at which defendant was ordered permanently detained pending trial. (CR 17.) This Court's Order of Detention specifically noted "[d]efendant poses a risk to the safety of other persons and the community based on instant offense allegations/weight of evidence . . . mental health history; alleged commission of offense while residing with proposed sureties suggest danger would not be mitigated by purported bond." (<u>Id.</u>, p. 4.)

On August 9, 2021, defendant filed the instant application to reconsider the Court's order of detention. (CR 34.) In his application, defendant provides no new or changed circumstances to

6

support his request that the Court reconsider its detention order. Rather, defendant provides a series of letters from family members who attest to his character. In fact, defendant appears to propose the very same terms of release that this Court previously rejected.

**III. ARGUMENT**

    **A. Legal Standard**

The Bail Reform Act of 1984 (the "Act") directs courts to impose those conditions of pretrial release that "will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(c)(1)(B), and permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," § 3142(e). Courts must consider several factors when determining whether and what conditions are appropriate, including: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).

    Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that pretrial release will not ensure the

7

appearance of the defendant need only be supported by a preponderance of the evidence. Motamedi, 767 F.2d at 1406. A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. § 3142(f).

The weight of the evidence is the least important of the factors and the statute neither requires not permits a pretrial determination that the person is guilty. Winsor, 785 F.2d at 757. However, the nature of the offense and the evidence of guilt is relevant to indicate the likelihood that the person will fail to appear or will pose a danger to the community. Id.

**B.      Defendant Is A Danger to Victim R.E. and the Community**

Defendant's release poses a grave risk to his ex-girlfriend and the community at large, and his proposed bond does nothing to mitigate these concerns. The Court should find that defendant continues to pose a danger to the community and order that he remain detained for the following four reasons. First, the nature of the offense conduct is strong evidence of defendant's dangerousness. As the complaint reflects, defendant engaged in a sustained and highly technical plot to engineer the murder of his ex-girlfriend. Defendant suggested different methods of killing his ex-girlfriend and was unequivocal about the intended result, demanding "proof of her death" and a "photo of her corpse and a photo of her tattoo for identification." To pursue his lethal goal, defendant utilized sophisticated and complex technology to access the Dark Web, communicated with an entity on the Dark Web while using an alias, and

ultimately paid for R.E.'s murder with Bitcoin. Defendant's conduct required a high degree of technological savvy.[1]

Second, defendant's obsession with the murder of his ex-girlfriend and avoiding law enforcement detection does not seem to have abated. Indeed, nothing in the record, defendant's application, or his personal history suggests that he is any less of a danger to her and the community. Moreover, defendant has previously indicated that he may suffer from various psychiatric issues, which only exacerbate the concern for dangerousness given his demonstrated intent to have R.E. murdered.

Third, during his communications with the UC, defendant repeatedly expressed a desire to avoid law enforcement detection. When he believed R.E. would be murdered, defendant made sure to place himself and his car on surveillance camera footage, while purchasing an item that would require his photo identification. Defendant unquestionably knew and appreciated the significance of his actions, doing whatever he could to avoid the consequences.

Fourth, and finally, the evidence of defendant's involvement in this crime is very strong and includes:

- Law enforcement was able to trace the Bitcoin payment made by Ula77 to the Dark Web group for R.E.'s murder to a CoinBase wallet associated with "Scott Berkett," using his defendant's parents' residence as the address, as well as defendant's date of birth, driver's license number, social security number, and phone number. Coinbase further provided the Bank of America savings account and Mastercard

---

[1] The government also understands that at the time of his arrest, defendant worked as a computer technician.

          debit card used to purchase the Bitcoin. Both are registered to defendant.

- Defendant used the same phone number to communicate with the UC as the number he used to make a reservation at a local hotel for R.E. during her visit to Los Angeles.
- Defendant was observed by surveillance making a Western Union payment to the UC.
- Defendant was arrested as he attempted to develop an alibi at the time he believed R.E. would be murdered.
- During his post-arrest interview, defendant admitted several key facts from the investigation, including facts that identified him as the individual speaking with the UC.

Given his history as well as the current allegations, the Court should find that defendant continues to present a danger to the community and, in particular, his ex-girlfriend.

**C.  Defendant Presents A Substantial Risk of Nonappearance**

Defendant presents a substantial risk of non-appearance. First, as discussed above, defendant appears singularly focused on the murder of his ex-girlfriend. There is nothing to suggest that a bond, secured or otherwise, would do anything to deter his conduct, let alone assure his presence in court. Second, defendant faces a significant sentence of imprisonment if convicted at trial, which creates an incentive to flee or to go into hiding in the Central District. The § 1958(a) count carries a statutory maximum sentence of 10 years. Defendant's Guidelines calculation, without acceptance, is 121-151 months. Such a lengthy prison sentence, especially when coupled with the strength of the evidence against defendant, provides a significant incentive for defendant to flee. Courts have

10

recognized this a basis for finding defendant is a flight risk. See United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); United States v. Gonzalez Claudio, 806 F.2d 334, 338 (2d Cir. 1986) ("It is entirely reasonable to conclude that a risk of flight is more likely in circumstances where evidence indicates that defendant . . . faces a substantial risk of being convicted of serious pending charges and receiving significant punishment.") Thus, the Court should also find that defendant is a risk of non-appearance.

### IV. DEFENDANT'S PROPOSED BOND CONDITIONS ARE INSUFFICIENT

As an initial matter, the government submits that the totality of the record shows defendant is not suitable for bond. Moreover, defendant's proposed bond has a number of problems. First, defendant appears to propose the same bond that the Court previously rejected. (Dkt. 16, 17.) Specifically, defendant proposes to secure his bond with his parents' house – the very same location at which he appears to have engaged in all of the charged conduct. As the Court previously found, living with his parents and jeopardizing their home did not deter defendant from engaging in serious illegal conduct (Dkt. 17, at 4), and there is nothing to suggest that anything has changed. Second, defendant proposes to limit his access to the internet in order to address concerns that he might continue to engage in the charged conduct. Of course, this type of condition is practically unworkable given the prevalence of internet-connected devices. Coupled with defendant's obvious and extensive technological savvy, such a condition is effectively meaningless. And third, defendant's obsession with the murder of his ex-

girlfriend, coupled with his purported psychiatric issues, likely sigificantly minimizes the deterrent effect that the loss of his parents' house might otherwise have. The Court previously rejected this proposed bond and it should do so again.

**V.  CONCLUSION**

For the foregoing reasons, based on the totality of the facts presented, the government respectfully requests that this Court order defendant remain detained pending trial.