STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KATHY YU (Cal. Bar No. 268210)
Assistant United States Attorney
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2431
    E-mail:   kathy.yu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-292-MCS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT SCOTT QUINN BERKETT |
| v. | |
| SCOTT QUINN BERKETT, | [Victim Impact Statements Filed Concurrently Under Seal] |
| Defendant. | **SENTENCING DATE:** September 12, 2022 at 3 P.M. |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Kathy Yu, hereby files its sentencing position for defendant Scott Quinn Berkett ("defendant").

    The government's sentencing position is based upon the attached memorandum of points and authorities, the concurrently filed Victim Impact Statements (filed under seal), the files and records in this case, the Presentence Investigation Report, and any other evidence or argument that the Court may wish to consider at the time of

sentencing.

Dated: August 22, 2022          Respectfully submitted,

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


       /s/
KATHY YU
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant refused to accept no for an answer.

In October 2020, Victim R.E. ("the Victim") and the defendant were romantically involved.  However, when she decided she no longer wanted to be with him, defendant would not – could not – accept her rejection.  Defendant decided if he could not be with her, no one could.  Enraged by her rejection, he sought out a hitman on the Dark Web to kill the Victim, paying $14,000, and providing detailed instructions on how he wanted the murder carried out (an accident or robbery gone wrong) and requested photographic proof of the murder. (Dkt. No. 1 (Complaint) at 10-15).)  Fortuitously, defendant's plot was foiled, and the government subsequently charged him with use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958.

In committing this offense, defendant demonstrated his callous disregard for human life, his sophisticated attempts to evade law enforcement detection, and his propensity to turn to violence when provoked.  Consistent with the plea agreement (Dkt. No. 57 (Plea Agreement) at ¶ 3(d)), therefore, the government recommends a sentence of 60 months' imprisonment.  The government further recommends a three-year period of supervised release (the maximum term available for this type of offense), a fine of $20,000, and a special assessment of $100.

**II.  DEFENDANT'S CONDUCT**

As set forth in the Plea Agreement (¶ 9), defendant admitted the following facts:

In approximately April 2021, defendant solicited and paid for murder-for-hire services via a website on the Dark Web ("Dark Web Group") that purportedly offered murder-for-fire services, in order to have victim R.E. murdered. Specifically, using the username "Ula77," and via the internet, defendant provided the Dark Web Group with specific directions and details about his target victim R.E. As payment for R.E.'s murder, defendant sent the Dark Web Group Bitcoin payments totaling approximately $13,000.

In fact, the Dark Web Group does not provide murder-for-hire services, and instead, provided defendant's communications and other related information to law enforcement.

In May 2021, an undercover law enforcement officer contacted defendant while posing as the hitman defendant believed he had hired from the Dark Web Group. On May 19, 2021, the undercover law enforcement sent defendant pictures of victim R.E. and defendant confirmed that R.E. was his intended victim and that defendant had made Bitcoin payments to obtain her murder. Defendant further requested proof of R.E.'s successful murder. Finally, defendant made an additional $1,000 payment to the undercover law enforcement officer via Western Union to obtain the murder of victim R.E.

**III. GUIDELINES CALCULATION**

The government concurs with the Probation Officer's calculations as to the offense level and criminal history. The PSR concluded that the base offense level was 32 based on U.S.S.G. § 2E1.4 (PSR ¶ 19). Coupled with a criminal history category of I (PSR ¶ 35), the Guidelines range is 87 to 108 months' imprisonment. (PSR ¶ 79.)

**IV. THE GOVERNMENT'S RECOMMENDATION IS SUPPORTED BY THE FACTS OF THIS CASE**

Based on the facts of this case, the government recommends a sentence of 60 months' imprisonment, a three-year period of supervised release, a fine of $20,000, and a special assessment of $100.[1]

**A. The Severity and Sophistication of the Offense and the Need to Protect the Public Are Aggravating Factors**

Defendant's crime was not a momentary lapse in judgment, but a premeditated plot to kill the Victim because she rejected his advances. While attempting to take a life is atrocious enough, defendant's chosen method of carrying out the crime – using the Dark Web to hire a hitman and cryptocurrency – speak to his sophistication, meticulous planning, and attempts to anonymize his illegal conduct in the commission of this offense, and are aggravating in nature.

The Victim, Victim's mom, Victim's sister, and Victim's dad submitted Victim Impact Statements, which have been concurrently filed under seal. All four statements touch on the anxiety and fears that have taken over their lives due to defendant's actions, and the permanent impact this crime has had – and will continue to have – on their lives.

"What the defendant has done to me will haunt me for the rest of my life," the Victim says, "[T]his is something I fear I'll never truly forget or recover from." Even a year later, she still suffers

---

[1] As of this filing, the government has not received any requests for restitution from the Victim, and does not anticipate requesting restitution in this matter.

from anxiety, shock, insomnia, and nightmares; the events "play[] over and over" in her mind "on an almost daily basis." (Ex. A at 1.) Even simple daily tasks like taking out the trash or working the night shift can leave the Victim paralyzed with angst, and such anxieties are exacerbated upon seeing someone who resembles the defendant or a passing glimpse of a California license plate. (Ex. A at 1; Ex. D at 1.)

The family shares in the Victim's feelings of helplessness and anxiety. The Victim's mom writes, "There is a man in this world that wants my child dead. A man that wants a picture of her corpse. If I word this too strongly, who's to say it won't anger him further. He isn't going to be locked up forever. If he was bold enough to do this, what else is he capable of?" (Ex. B at 1.) They recount how the Victim was before the offense – someone who had "a room full of stuffed animals, watches cartoons," "dots her I's with hearts," who was "always so kind to everyone" and "always thinking of others over herself." (Ex. B at 1; Ex C. at 1.) The family has had to watch their loved one be "destroyed and broken," with the knowledge that defendant "fully intended to take [the Victim] . . . without hesitation," and that "[t]he rest of her life will be filled with the constant fear that someone will kill her." (Ex C at 1.) Nothing will "restore" the Victim to the way she was before she met the defendant. (Ex. D at 1.)

While the Victim has tried to move on, defendant "stole[] her innocence" and "her ability to trust herself and everyone else." (Ex. B at 1.) The Victim's family has been forced to move because defendant knows where they live and they are fearful of what he may do upon release. (Ex. B at 1.) The family also reflected on their

6

fears for other women who may come into defendant's life after incarceration. (Ex. B at 1; Ex. C at 1.)

No family should endure what the Victim's family has had to endure. Only a serious sentence by this Court can reflect the severity of the offense, protect the public against this defendant, and deter other would-be offenders from engaging in such conduct.

### B. Defendant's Mental Health Issues Are Already Reflected in the Government's Recommendation of a 60-Month Sentence

Defendant's mental health condition is a mitigating factor (PSR ¶¶ 58-60); however, it is already accounted for in the government's recommendation of 60 months' imprisonment. A further variance would not reflect the seriousness of the offense or the permanent harm defendant inflicted on the Victim and her family.

### C. A Three-Year Term of Supervised Release Is Appropriate

Given defendant's impulse control issues, tendency to turn to violence when provoked, and admitted and documented mental health issues (PSR ¶¶ 58-60), the government believes the maximum term of supervised release of three years is reasonable and appropriate in this case. A three-year period of supervised release will allow continued monitoring of defendant's adjustment to society after serving his term of imprisonment, ensure that he continues to obtain mental health treatment and/or other rehabilitative care, and help protect the public from any relapses. 18 U.S.C. 3583(c).

### D. A Fine of $20,000 Should be Imposed

The Guidelines state that, "the court shall impose a fine in all cases, except where the defendant establishes that [she] is unable to pay and is not likely to become able to pay." U.S.S.G. § 5E1.2 (a) (emphasis added). The Probation Officer concludes that defendant

"does not have the ability to make an immediate payment toward a fine." (PSR ¶ 75.) However, while the former may be satisfied here (defendant is currently unable to pay), the latter (defendant's future inability to pay) is not.

Defendant is 25 years old, has a high school degree (PSR ¶ 48), has specialized training as a software technician (PSR ¶ 67), and up until the time of the offense, was working as a software technician making $650 a month (PSR ¶ 69). Notably, defendant already has a job lined up when he is released – as a software technician with his previous employer. (PSR ¶ 50.)

In determining the propriety and amount of a fine, the Court "shall consider" the following, among other things: "the need for the combined sentence to reflect the seriousness of the offense . . . to promote respect for the law, to provide just punishment, and to afford adequate deterrence"; "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of [his] earning capacity and financial resources"; and "the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed." (U.S.S.G. §§ 5E1.2(d); see also 18 U.S.C. § 3572(a).) As the Guidelines make clear, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanction imposed, is punitive." (U.S.S.G. § 5E1.2(d).) Here, the Guidelines range for a fine against defendant $30,000 to $250,000. (PSR ¶ 87.)

Based on the facts in this case (in particular, defendant's future ability to pay), the government recommends a below-Guidelines fine of $20,000. Defendant is currently 25 years old, has no

8

liabilities, has no dependents, and while the income from his former employment was not substantial, he has demonstrated he can find and maintain stable employment – so much so that he already has employment for when he is released. See United States v. Orlando, 553 F.3d 1235, 1240 (9th Cir. 2009) ("The defendant bears the burden of proving he is unable to pay the fine . . . However, the court may fine a currently indigent defendant, if it finds that he has earning capacity to pay the fine in the future."); United States v. Haggard, 41 F.3d 1320, 1329 (9th Cir. 1994) (no error in imposing fine where defendant could "earn the money to pay a fine by working in the Inmate Financial Responsibility program while incarcerated"). See generally United States v. Stoddard, 150 F.3d 1140, 1147 (9th Cir. 1998) (quotations omitted) (analyzing "future ability to pay" by considering defendant's "history of . . . professional and business life," which showed he was "a successful individual who could become successful again"). Indeed, despite defendant living at home and making only $650 per month as a software technician, his offense involved the payment of approximately $14,000 to have the Victim killed – demonstrating his access to financial resources. (PSR ¶¶ 9-10.)

Assuming the Court imposes the sentence recommended by the government (60 months), defendant would only be about 30 years old at the time of release, and would still have many employable years before him. In conjunction with a custodial sentence of 60 months as well as a three-year period of supervised release, a fine of $20,000 further impresses upon defendant the seriousness of the offense, as well as afford additional deterrence – in the form of regular payments.

**V.    CONCLUSION**

Based on the facts of this case, the government recommends a 60 month term of imprisonment, a three-year period of supervised release, a fine of $20,000, and a special assessment of $100.